IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENYETTA MARTIN, o/b/o M.T.G.,   )
                             )
      Plaintiff,         )
                             )     No. 14 C 9048
vs.                        )
                             )     Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,    )
                             )
      Defendant.     )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Kenyetta Martin, on behalf of her minor son, M.T.G. ("MG"), has filed a motion

for summary judgment seeking reversal or remand of the final decision of the Commissioner of

Social Security ("Commissioner") denying MG's application for disability insurance benefits

("DIB") (doc. # 19). The Commissioner filed her own motion seeking affirmance of the decision

denying benefits (docs. # 29, 30). For the following reasons, we grant Ms. Martin's motion and

deny the Commissioner's motion.

## I.

We begin with the procedural history of this case. Ms. Martin applied for DIB on her

son's behalf on July 21, 2011, alleging that MG became disabled on May 10, 2010 as result of

his various disabilities, which include Attention Deficit Hyperactivity Disorder ("ADHD"), a

Learning Disability, and Generalized Anxiety Disorder ("GAD") (R. 20). The application was

---

[1] On December 2, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

denied initially on October 4, 2011, and upon reconsideration on February 15, 2012 (*Id.*). Upon timely request, a hearing was held before Administrative Law Judge ("ALJ") James D. Wascher on February 13, 2013 (R. 46-77). The ALJ issued an unfavorable decision on July 24, 2013, finding that MG is not disabled (R. 20-39). The Appeals Council then denied Ms. Martin's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We proceed with a summary of the administrative record. Part A briefly sets forth MG's background, followed by his medical record in Part B and his mental health record in Part C. Part D discusses the testimony provided at the hearing before the ALJ, and Part E sets forth the ALJ's written opinion.

## A.

MG was born on July 13, 2002 and was ten years old at the time of the hearing before the ALJ. He lives with his mother and attends elementary school. MG's father died in 2007. MG was diagnosed with ADHD in 2010 and was given a prescription for Concerta at that time. The dosage of Concerta has been adjusted upwards twice since MG's initial diagnosis. MG also has been diagnosed with a learning disorder and anxiety. He has switched schools numerous times, struggles with his core subjects (especially math), receives special education services, and has a limited social circle.

## B.

The relevant medical record begins on May 12, 2010, when notes from Rush Pediatric Primary Care Center ("RPPCC") reflect that MG was screened for ADHD at a community clinic. At that time, a medical doctor at the clinic diagnosed MG with ADHD and started him on the

prescription drug Concerta, at a dosage of 18 milligrams ("mg") (R. 412). RPPCC notes from January 3, 2011 state that MG had been followed by a Dr. Thomas, but that Ms. Martin wanted a referral to a new specialist (R. 321). The doctor who examined MG on that day, Dr. Ian Macomber, noted that Dr. Thomas had recently increased MG's Concerta dosage to 27 mg, and that Ms. Martin felt that this dosage was more effective (*Id.*). Dr. Macomber also noted that Ms. Martin had been seeking an Individualized Education Plan ("IEP") from her son's school, but that the school had not agreed to provide one (*Id.*). Dr. Macomber noted that MG was in the third grade and was receiving poor grades, including failing marks in listening and reading (R. 322). Dr. Macomber referred MG to Dr. Cesar Ochoa for management of his ADHD (R. 323).

On May 17, 2011, MG underwent a developmental behavioral pediatric evaluation with Dr. Ochoa at the request of Ms. Martin, who was concerned about her son's ADHD, academic difficulties, and behavioral challenges (R. 510-11). Dr. Ochoa noted that MG had been receiving counseling services for the past eight or nine months through the Mind Center, and that a counselor there had diagnosed him with depression (R. 510). Ms. Martin told Dr. Ochoa that ever since kindergarten, her son had been described as off task, hyperactive, and a slow learner, with a history of academic underachievement (*Id.*). While the Concerta slowed him down and he was able to participate and learn more in school, Ms. Martin noted that her son was failing in reading, was painstakingly slow in writing, could not count money, and had difficulties with multiplication (*Id.*). She stated that MG did not seem to listen when talked to and that he frequently "shut down" conversationally, but that he interacted well with children at school and did well in sports (R. 511). Dr. Ochoa noted MG to be serious, quiet, and cooperative, but with a depressed mood and a "history significant for hyperactivity, impulsivity, and inattention" (R.

3

511). Dr. Ochoa's diagnostic impressions were: ADHD, academic under-achievement, and suspected mood disorder/depression.

On June 21, 2011, Michelle Greene, Ph.D. and Michael Nelson, Ph.D., of Rush University Division of Pediatric Psychology, examined MG and completed a psychoeducational evaluation that involved the administration of numerous aptitude tests, as well as caregiver and teacher questionnaires and a neurodevelopmental test battery (R. 553-82). Testing conditions involved two sessions over two consecutive days, each lasting 2.5 hours, for which it is notable that on the first day, MG failed to receive his daily dose of Concerta, but that on the second day he was medicated (R. 535-56). The examiners' subsequent report noted that MG was eight years old at the time of testing, had recently completed the third grade, and was described by his mother as having a history of inattention in school and at home: his homework could take him up to four hours to complete due to slow handwriting, the need for redirection, and a lack of persistence (R. 554).

Turning to the results of the evaluation, Drs. Greene and Nelson observed that with respect to intellectual functioning, MG had a full scale intelligence quotient ("IQ") score of 74, which placed him in the "borderline" intelligence range and at the fourth percentile as compared to his peers (R. 556). His verbal comprehension score was 87 (19th percentile, "low average" range); working memory was 86 (18th percentile, "low average" range); perceptual reasoning was 77 (6th percentile, "borderline" range); and non-verbal processing speed was 68 (second percentile, "extremely low" range) (R. 556-57).

MG's performance on measures of verbal comprehension scored within the broad average range, while his comprehension and expression of social judgment scored in the low average range, around two years below expectation (R. 557). His performance on perceptual

4

reasoning or nonverbal subtests ranged from 1.5 to 2.5 years below expectations for his age (*Id.*). His visual analysis and synthesis was approximately 1.5 years below age-expectation, and his non-verbal conceptual reasoning scored at 2.5 years below expectations (*Id.*). Other testing categories revealed results that placed MG significantly behind his peers: in the Academic Achievement category, MG's writing skills scored more than two grades below his current grade placement, in the extremely low range (first percentile); his performance on reading and spelling fell 1.5 years below expectations; and his math abilities fell in the extremely low to borderline range, more than two grades below his peers (between the third and 0.01 percentile) (R. 558-59). The test administrators found MG's "math skills are largely consistent with his non-verbal learning potential . . . . [And, as] with [his] performance on processing speed and writing tasks, his math performance was characterized by exceedingly slow response time accompanied by a high degree of inaccuracy" (R. 559).

Drs. Greene and Nelson also found that MG's scores on "Other Cognitive and Performance Measures" indicated that his "performance actually was worse when he was tak[ing] his medication for attention" (R. 560). Without a dose of Concerta, "the chances were 84.6 out of 100 that [he] had a significant problem with attention," while with a dose of Concerta, "the chances were 99.90 out of 100 that [he] had a significant problem with attention" (*Id.*). Drs. Greene and Nelson found MG's results indicated "poor sustained attention and weak working memory and processing speed, in addition to his mother's and teacher's reports of inattention in both home and school environments" (R. 563).

On June 22, 2011, Dr. Ochoa examined MG and then summarized his findings in a letter addressed to Dr. Sherald Leonard (also a Rush doctor) (R. 513-14). In his letter, Dr. Ochoa memorialized Ms. Martin's worry that her son's medication was wearing off more

quickly, lasting for only approximately nine hours (R. 513). Dr. Ochoa noted that teacher reports indicated that the medication was working well (*Id.*). MG's diagnosis at that time included ADHD, academic underachievement, and emotional symptoms (R. 514).

On September 30, 2011, Donna Hudspeth, Psy.D., completed a childhood disability determination relative to MG on behalf of the Disability Determination Services ("DDS") (R. 583-88). Dr. Hudspeth opined that MG had severe impairments, but that his impairments did not meet, medically equal, or functionally equal the Listings (R. 583). In particular, Dr. Hudspeth assessed MG with marked limitations with respect to attending and completing tasks; less than marked limitations with respect to acquiring and using information; less than marked limitations with respect to interacting and relating with others; and no limitations with respect to moving about and manipulating objects; caring for himself; and his health and physical well-being (R. 585-86). Dr. Hudspeth noted a history of non-compliance with MG's Concerta medication, as well as a medical history suggesting that MG's mother encouraged him to believe that people are bad and to fear the world, thereby contributing to his diagnosis of GAD and lack of peer relationships (R. 588). This evaluation was affirmed upon reconsideration by Drs. Cosme Cagas and Kirk Boyenga on February 14, 2012 (R. 603-08).

MG followed-up with Dr. Ochoa on October 25, 2011 (R. 597-99). Dr. Ochoa continued to prescribe Concerta, 36 mg, to address MG's ADHD, and advised that he should have an individualized education plan (IEP) to address his "borderline non-verbal reasoning skills, low processing speed, and poor academic achievement" (R. 598). Dr. Ochoa also recommended counseling to address MG's emotional difficulties (*Id.*).

Over the course of a few months between December 2011 and February 2012, MG underwent a Chicago Public Schools School Nurse Assessment, a Psychological Initial

Evaluation, and a Social Work Evaluation (R. 609-17). The Nurse's Assessment noted no reporting of behavioral problems in the classroom, although the nurse who completed the form noted that MG "squirms" and is in "constant motion" (R. 611). The school psychologist noted "[MG] appears to have average intelligence," has no "significant social-emotional difficulties," and was "not suspected of cognitive impairment" (R. 613-14). The psychologist also noted that MG demonstrated basic reading skills at the third grade level (at the time, MG was in fourth grade), although his math skills were akin to a year-end second grader (R. 614). Finally, the social worker—after interviewing MG and asking him about his classes and classmates and favorite things to do—opined that MG "is fully capable of conducting all activities of daily living and self-help activities age appropriately and independently. He is polite and cooperative with adults in the school setting. He indicated that he gets along acceptably with children who are interested in getting along well with him" (R. 617). The social worker saw no need to provide further services to MG (*Id.*).

On January 9, 2012, at the request of the SSA, MG's school counselor completed a request for information regarding MG. The counselor wrote that he was "a very well-mannered child. He is currently receiving F's in all core subjects. [He] has a difficult time focusing and adjusting in the classroom setting" (R. 601-02).

MG returned to the Rush Behavioral and Developmental clinic numerous times in 2012. On January 27, 2012, Ms. Martin complained that she did not believe her son was learning appropriately at school, that his medication wears off by 5 p.m. (although she agreed the 36 mg dose had been helpful and lasted longer), and that he daydreams at school. Ms. Martin also reported that her son was bullied verbally and physically and that a child was suspended for trying to choke him (R. 640-41). On June 4, 2012, Ms. Martin reported to the clinic that her son

was starting a new magnet school due to bullying (R. 643). On October 24, 2012, Ms. Martin complained that the Concerta was not helping as much as previously (R. 646). At school, MG was doing better with reading but fluency and comprehension were still an issue and math was still an area of concern (*Id.*). His school reported no behavioral concerns (*Id.*).

MG received two educational accommodation plans from the Chicago Public School District. The first is a Section 504 Plan dated April 2010 that accommodated MG's Concerta prescription and provided that he participate in behavior modification sessions every Thursday (R. 348-53). The second is an IEP dated June 13, 2012 (R. 221-44). The IEP indicated that MG was well-behaved and friendly with his peers, but that he "is unable to complete tasks and assignments in the classroom. His lack of focus causes him to work at a very slow pace. [He] does not participate or take part in class discussions. His teachers report that he struggles to retain recently retained skills, especially in math" (R. 222).

Ms. Martin and MG returned to the Rush Behavioral and Developmental Clinic on January 10, 2013 for a Concerta refill after running out three days earlier (R. 653). Ms. Martin stated at that time that the Concerta had improved her son's attention and that consequently school is "going better" (*Id.*). MG admitted that his medication made him feel "calm" (*Id.*).

## C.

The medical record also contains records pertaining to MG's receipt of counseling services through the Community Mental Health Council (CMHC) and Rush University Medical Center. CMHC records indicate that MG received counseling services, either alone or with his mother, between August 2010 and March 2011 (R. 296-312). These notes frequently indicate that MG was well-behaved and quiet, but needed redirection. MG's mood was mostly sad (R. 305).

The therapist noted that MG reported having no friends and thought that friends were "bad" (R. 296, 303). An assessment dated December 27, 2010, provided a diagnosis of ADHD of the "combined" variant,[2] as well as Learning Disability, Asthma, and educational problems, and provided a CGAS of 55-60 (R. 298). On April 2011, MG reported to the therapist that he felt happy as compared to when he first started counseling (R. 299.). The therapist noted that MG's recent relocation to a new school seemed to have had a positive effect on his life (*Id.*).

On June 7, 2011, MG and his mother returned to CMHC to complete a yearly updated intake (R. 534-49), where MG saw a Licensed Practitioner of the Healing Arts (LPHA).[3] The LPHA signed the updated paperwork that provided a diagnostic impression of GAD, a diagnosis code of V71.09 ("observation for other suspected mental condition"), Asthma, problems with social environment, and a CGAS score of 65 (R. 540).[4] The LPHA noted that MG's mother

---

[2]The American Psychiatric Association has identified three different types of ADHD: (1) the "inattentive and distractible" type; (2) the "impulsive-hyperactive" type; and (3) the "combined" type, which is most common in children and involves symptoms of both inattention and hyperactivity-impulsivity. *See* http://www.hopkinsmedicine.org/healthlibrary/conditions/mental_health_disorders/attention-deficit_hyperactivity_disorder_adhd_in_children_90,P02552/.

[3]An LPHA is "[a]n Illinois licensed health care practitioner who, within the scope of State law, has the ability to independently make a clinical assessment, certify a diagnosis and recommend treatment for persons with a mental illness." 59 Ill. Admin. Code § 132.25. LPHA's include physicians, advanced practice nurses, clinical psychologists, social workers, and other counselors. *Id.*; *see also N.B. v. Hamos*, 26 F.Supp.3d 765, 766 n.7 (N.D. Ill. 2014) (defining LPHA). Some, but not all, of these professionals qualify as acceptable medical sources. *See* SSR 06-3p; *Pontarelli v. Colvin*, No. 13 C 1015, 2014 WL 3056616, at *6 (N.D. Ill. July 7, 2014). In this case, the findings of the LPHA who met with MG and his mother are not central to the issues on appeal, so it is not critical whether this LPHA fell within the category of acceptable medical source or not. Even so, we note that an ALJ is required by SSR 06-03 to consider evidence from "non-medical sources," although opinions of treating physicians and other examining physicians generally are given more weight. *Dogan v. Astrue*, 751 F.Supp.2d 1029, 1039 (N.D. Ind. 2010)

[4]CGAS, or Children's Global Assessment Scale, is "a precursor to the GAF [Global Assessment of Functioning] scale and is used for children eighteen and under." *Handford ex. rel. I.H. v. Colvin*, No. 12 C 9173, 2014 WL 114173, *5 n.5 (N.D. Ill. Jan. 10, 2014). A score of 51-60 indicates that the child has "[m]oderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers)." *See* https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf. A score of 61-70 indicates that the child has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

reported that she had received fewer "bad behavior" reports from MG's new school, that MG had made a few friends, but that her son still cries for unknown reasons and experiences anxiety, irritation, and difficulty concentrating (R. 540). Ms. Martin reported that her son's medication "sometimes helps" (*Id.*). The LPHA noted that MG's mother "tells [MG] that people are bad and therefore only permits him to be around her and his grandmother" (*Id.*). The LPHA opined that MG's anxieties are the result of "modeling his mother's coping mechanisms" (*Id.*). Treatment recommendations were for the continuation of therapy to manage symptoms of anxiety, and continuation with a psychiatrist for medication management of his ADHD (R. 541).

MG also underwent a mental health evaluation at Rush Ambulatory Behavioral Health on June 11, 2012 (R. 658-67). The therapist noted diagnoses of ADD and a learning disorder, a CGAS of 51-60, and moderate difficulty in social, occupational or school functioning (R. 662). A follow-up on June 21, 2012 revised MG's diagnosis to ADHD, noted that both MG and his mother presented with symptoms of anxiety, and that MG became tearful and fidgety during discussion of his ADHD (R. 663). MG continued to see the same therapist, Marcia Ward, until February 2013. During the last few months of treatment, MG's mother reported that MG continued to have emotional trouble and poor academic and social problems at school, with the academic problems involving inattention and poor retention of information (R. 666, 668). Ms.

---

Recently, questions have been raised about the utility of the GAF scores as an assessment tool. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM–5* 16 (5th ed. May 27, 2013) (known as the "DSM-5") (dropping GAF scores from most recent version of the DSM-5); *See* Soc. Sec. Admin., Global Assessment of Functioning (GAF) Evidence in Disability Adjudication, AM-13066 (July 22, 2013) ("AM-13066") (expressing concerns with the GAF ratings for being "neither standardized nor based on normative data" and "not designed to predict outcome," yet noting per revision on October 14, 2014 (AM-13066 REV.) that a GAF score is still medical opinion evidence under 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) when it comes from an acceptable medical source); *see also Carter v. Colvin*, No. 2:14-CV-416-PRC, 2016 WL 491640, at *4 (N.D. Ind. Feb. 8, 2016); *Coppage v. Colvin*, No. 4:14-CV-211-D, 2015 WL 9899342, at *11 n. 6 (E.D.N.C. Dec. 14, 2015). We note that the publication of the DSM-5 occurred on May 27, 2014— two months before the ALJ's final decision in this case—and that AM-13066 became effective two days before the ALJ issued his opinion.

Martin reported that her son had switched schools for fifth grade and had received a C in reading, a D in math, and an F in science (R. 666). Both Ms. Martin and her son reported to the therapist that they had each experienced visual hallucinations, akin to seeing a ghost, of MG's deceased father (R. 670). The therapist noted that Ms. Martin demonstrated anxiety during the sessions and that her son became increasingly anxious as the sessions continued, including stuttering and crying (R. 671). MG reported on February 21, 2013 that he did not have any friends and did not want any because of their behavior (R. 672).

Finally, the record contains a Teacher Questionnaire completed on February 18, 2013, by Michael McKinney, MG's English teacher at his new school, Miles Davis Magnet Academy (R. 284-91). The document indicated that it should be completed by the person "most familiar with the child's overall functioning" (R. 284). Mr. McKinney wrote on the front page: "This is not me" but completed the form and indicated that he observed no problems with MG in any of the specified domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself (R. 284-91). Mr. McKinney also indicated on the form that he spent one and a half hours a week with MG in a class containing 20 students, that he did not know whether or not MG was on medication, and did not know whether his abilities changed after taking medication (*Id.*). The form asked for a comparison of MG's functioning to that of a same-aged child who does not suffer from any impairments (*Id.*). Mr. McKinney did not add any commentary to the form.

### D.

At the hearing before the ALJ on July 24, 2013, MG, MG's mother, and a psychological expert ("PE") all testified. MG testified first, and began by describing school and daily activities. MG stated that he was in the fifth grade and that he has two teachers (R. 52-53). He

11

stated that he liked his teachers, but that he did not have a favorite subject and liked math the least (R. 54). He testified that he sometimes has a hard time paying attention in class, and that he does not have any good friends in class (R. 54-55). He stated that he gets homework at night and that his mother helps him with it (R. 55). MG explained that he takes medicine every day that makes him feel "calm" (R. 57).

Ms. Martin testified next. She explained that her son takes 36 milligrams of Concerta a day (R. 60), and that when he takes this medicine, it blocks his attention deficiency and his behavior is "great" (R. 60-61). Nevertheless, Ms. Martin stated that her son still has trouble comprehending the information he learns at school (*Id.*). She explained that she was able to get him an IEP when he was in the fourth grade, so he has not had to repeat any grades (R. 63). As for chores around the house, Ms. Martin stated that her son helps with laundry and sweeping, but that he forgets to take the garbage out (R. 62). As for hygiene, Ms. Martin stated that her son does not match up his clothes very well and that he has to be reminded to shower, to rinse his body clean of soap, and to brush his teeth (*Id.*). Ms. Martin explained that MG began therapy in June 2012 for anxiety because he "shuts down, he doesn't speak, [and] he emotionally cries" (R. 64). She stated that she believes her son cries about three times a week, for a short period of time, often when he is spoken to by a teacher or doctor (*Id.*). Ms. Martin stated that her son's emotional issues have persisted since his father's death in 2007 (R. 65).

Finally, the PE, Dr. Kravitz, testified. The PE stated that he had reviewed the case file pertaining to MG and had also listened to the hearing testimony (R. 66). Based on the foregoing, the PE stated that he found MG's primary disability to be ADHD, followed by Learning Disability and GAD, but that he did not find any of these impairments, singly or in combination, to meet or medically equal a listing (R. 70-71). Looking at MG's language IQ and testing scores,

12

the PE found MG to be within the borderline for average range intelligence, with a full scale IQ of 74 (R. 71-72). MG's mathematics ability was more problematic, in the "medium impaired range" (R. 72). MG's area of "significant impairment" was attending and completing tasks (*Id.*). The PE noted that MG's "lack of focus causes him to work at a very slow pace," yet there was also evidence (notes from Rush, as well as Ms. Martin's testimony) that MG had responded well to his medication (R. 73). The PE stated that the DDS consultants had found MG to have marked impairment in attending and completing tasks, and that he would not argue with this determination (*Id.*). The PE found less impairment in the category of interacting or relating to others; no significant impairment with MG's ability to care for himself, and no impairments relative to moving and manipulating objects (R. 74).

## E.

On July 24, 2013, the ALJ issued a 20-page, single-spaced written opinion finding MG not disabled pursuant to section 1614(a)(3)(C) of the Social Security Act (R. 20-39). Within the meaning of the Social Security Act, a child (defined as an individual under the age of 18) is disabled if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Giles v. Astrue,* 483 F.3d 483, 486–87 (7th Cir. 2007). At Step 1, the ALJ must determine whether the claimant has engaged in substantial gainful activity ("SGA"). *Id.* If he has not engaged in SGA, then the ALJ determines at Step 2 whether the claimant has a severe impairment or combination of impairments. *Id.* If so, then the ALJ proceeds in Step 3 to determine whether the claimant has an impairment(s) that

meets, or is medically or functionally equivalent to, one of the listings of impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

In this case, at Step 1, the ALJ found that MG is a school-age child who has not engaged in SGA since his application date of July 21, 2011 (R. 23). At Step 2, the ALJ found that MG has the following severe impairments: ADHD, Learning Disability, and GAD (*Id.*). At Step 3, the ALJ found that MG does not have an impairment or combination of impairments that meets, medically equals, or is the functional equivalent of the following listings: Section 112.02 (Organic Mental Disorders), 112.06 (Anxiety Disorders), and 112.11 (ADHD) (*Id.*). Accordingly, the ALJ found MG not disabled.

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Ms. Martin does not challenge the ALJ's determination that MG's impairments fail to meet, and are not the functional equivalent, of Listings 112.02 or 112.06. Rather, Ms. Martin focuses her argument on the determination that MG's condition does not meet and is not functionally equivalent to Listing 112.11. Ms. Martin contends that in making this determination,

14

the ALJ improperly substituted his own opinion for that of the medical experts, ignored and failed to give proper weight to treating physicians, and cherry-picked evidence that supported his determination (Pl.'s Mem. in Supp. Mot. Summ. J. ("Pl.'s Mem.") (doc. # 19) at 6-12). The Commissioner counters that the ALJ reasonably found that MG did not meet the criteria for Listing 112.11 (Def.'s Mem. in Supp. Mot. Summ. J. ("Def.'s Mem.") (doc. # 30) at 6-12). For the following reasons, we find that the ALJ's determination failed to fully analyze whether MG's impairments or combination of impairments met or medically equaled Listing 112.11, and that this deficiency requires a remand.

### A.

We turn first to Ms. Martin's argument that the ALJ should have found that her son's severe impairments met or medically equaled Listing 112.11. To satisfy that listing, the medical evidence must satisfy both paragraphs A and B of the listing. Paragraph A requires medically documented findings of marked inattention, marked impulsiveness, and marked hyperactivity. *See* 20 C.F.R. § 404, Subpt. P, App. 1, Listing 112.11.[5] Paragraph B requires medical findings supporting at least two of the following: (a) marked impairment in age-appropriate cognitive/communicative function; (b) marked impairment in age-appropriate social functioning; (c) marked impairment in age-appropriate personal functioning; or (d) marked difficulties in maintaining concentration, persistence, or pace. *Id.* Here, the ALJ found that "[n]o acceptable medical source has mentioned findings equivalent in severity" to the Listings, nor does the

---

[5]Listing 112.00 states that where "marked" is used "as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A "marked" limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function [based upon age-appropriate expectations] independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404, Subpt. P, App. 1, listing 112.00C [Mental Disorders]. Furthermore, "[w]hen standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction." *Id.*

record contain "medically documented findings of marked inattention, marked impulsiveness, or marked hyperactivity with medication compliance" (the paragraph A criteria) (R. 23) (emphasis in original). Additionally, the ALJ found that the record does not support the finding that MG had a marked impairment in any of the four paragraph B categories (*Id.*).[6] The ALJ did not elaborate on these conclusions, but instead immediately shifted his focus to the separate consideration of whether MG's severe impairments were functionally equivalent to the listing.

We agree with Ms. Martin that the ALJ's analysis with regard to whether MG met or medically equaled Listing 112.11 was insufficient, and while we decline to do as Ms. Martin suggests and find her son disabled, we find that the ALJ's unexplained conclusions require a remand. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005) (finding that "[a]n award of benefits is appropriate only where all factual issues have been resolved and the "record can yield but one supportable conclusion"); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (finding that "a lack of reasoning prevents us from applying the decision structure undergirding disability determinations to a substantive analysis of [the claimant's] impairments"). More specifically, we find the ALJ's explanation of his ruling deficient on the following grounds.

*First*, Listing 112.11 specifically states that an evaluation of the paragraph A criteria shall be based on documented medical findings, including "consideration of historical or other information from parents or other individuals who have knowledge of the child, when such information is needed and available . . . including, if necessary, the results of appropriate

---

[6]Listing 112.00, which broadly encompasses "mental disorders" and includes within it 11 sub-categories, including Listing 112.11, clarifies that "[t]he purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children. Standardized tests of social or cognitive function and adaptive behavior are frequently available and appropriate for the evaluation of children and, thus, such tests are included in the paragraph B functional parameters. The functional restrictions in paragraph B must be the result of the mental disorder which is manifested by the medical findings in paragraph A." 20 C.F.R. Pt. 404, Subpt. P., App. 1, 112.00 [Mental Disorders].

standardized psychological tests." 20 C.F.R. Pt. 404, Subpt. P., App. 1., Listing 112.11. In this case, the ALJ's opinion stated only that he found the record devoid of "medically documented findings indicating marked inattention, marked impulsiveness, or marked hyperactivity," but this statement gives no indication as to which documents he considered relevant to his conclusion, if any. In the absence of any discussion, we cannot be certain whether the ALJ contemplated the 2011 psychoeducational report by Drs. Greene and Nelson, which observed MG to have "poor" sustained attention consistent with a diagnosis of ADHD, and noted that MG's teachers reported problems with inattention, including that MG "has a short attention span," "is easily distracted from class work" and "never listens attentively" (R. 561, 563).

Likewise, we cannot know whether the ALJ considered the results of the Conners' Continuous Performance Test report, as administered to MG by Drs. Greene and Nelson.[7] This report indicated to a confidence index ("CI") of 99.90% that MG had a "[c]linically significant attention problem," as suggested by "markedly atypical" responses (as compared to a normative group), in six out of twelve "overall measures" categories (R. 495). While we do not conclude that this or any other evidence necessarily requires a finding of marked inattention, impulsiveness and hyperactivity, we consider it relevant to the inquiry of whether MG did have these impairments, particularly in light of the statements of other courts in this district and elsewhere that an ADHD diagnosis, in and of itself, implies a significant level of inattention, hyperactivity, and impulsivity. *See Rodriguez v. Colvin*, No. 12 C 9367, 2014 WL 1612991, at *8 (N.D. Ill. April 22, 2014) (finding that "[t]o diagnose a child as having ADHD, a clinician

---

[7]This computerized assessment evaluates attention and provides a confidence index (CI) indicating the likelihood that the examinee's responses fit those provided by individuals with ADHD. *See* http://www.mhs.com/product.aspx?gr=edu&prod=cpt3&id=overviewtest

must find either marked inattention or marked hyperactivity over a period of time. Therefore, the ADHD diagnosis alone reflects a medically documented finding of marked inattention, marked hyperactivity, or both") (citing *Taylor ex rel. McKinnies v. Barnhart,* 333 F.Supp.2d 846, 854 (E.D. Mo. 2004)); *Love v. Law School Admission Council, Inc.,* 513 F. Supp. 2d 206, 211 (E.D. Pa. 2007) (finding that while ADHD behavioral symptoms "can vary in both extent and type," but that regardless of type, "an individual must demonstrate "that the evidence of impairment is clinically significant"); *see also Harshaw v. Bethany Christian Services,* 714 F.Supp.2d 771, 785 n.9 (W.D. Mich. 2010) (discussing *Love* and diagnostic criteria for ADHD). Here, the ALJ's conclusion is silent as to the scope of the evidence he reviewed for purposes of the paragraph A analysis, and this precludes our meaningful review. A remand is appropriate where a decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *See Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

*Second,* the ALJ's paragraph A-related conclusion that the record was devoid of "medically documented findings of marked inattention, marked impulsiveness, or marked hyperactivity with medication compliance" overlooks evidence in the record suggesting just the opposite—that MG struggled even when medicated. Most notable of this evidence is the finding by Drs. Greene and Nelson that MG's "performance was actually worse when he was tak[ing] his medication for attention," and that when medicated, "the chances were 99.90 out of 100 that [MG] had a significant problem with attention" (R. 560). Similarly, Drs. Greene and Nelson noted that MG's performance on the Conners' test "actually was worse when he was tak[ing] his medication for attention" (*Id.*). These observations are at odds with the ALJ's conclusions, yet we cannot ascertain whether the ALJ considered them as part of his analysis because he did not mention them.

While an ALJ need not recite every item of evidence in the record, *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010), he must confront evidence that is central to his conclusions— whether it supports or is at odds with that conclusion. *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004); *Phillips v. Astrue,* 601 F.Supp.2d 1020, 1029 (N.D. Ill. 2009). In this case, the ALJ did a laudable job of recounting a very complex and lengthy record. But his failure to discuss the Greene and Nelson report that MG performed poorly without medication, and even more poorly with medication, is problematic, especially where the ALJ gave particular emphasis (down to the underlining of several words) to his finding that MG did not have "medically documented findings of marked inattention, marked impulsiveness, or marked hyperactivity with medication compliance" (R. 23).

*Third,* the same problems persist with respect to the paragraph B category, which similarly requires an evaluation of not just medically-documented findings, but also information from parents or other individuals who have knowledge of the child, including standardized tests to determine whether there are any marked impairments in four domains: age-appropriate cognitive/communicative function; (b) age-appropriate social functioning; (c) age-appropriate personal functioning; or (d) maintaining concentration, persistence, or pace. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 112.02 (applicable to Listing 112.11). In this case, the ALJ concluded, without elaboration, that MG had no marked impairment in any of the four relevant domains.

However, Drs. Greene and Nelson administered a battery of psychoeducation tests which support a finding that MG's performance fell into the "marked" range in numerous skill sets— meaning that his results fell at, or more than, two standard deviations below the mean score of

100; in other words, a score of 70 or less (R. 557-59).[8] We recognize that MG's full scale IQ was a 74. But he also scored a 68 in "processing speed," while his "academic fluency" was a 68, his "writing fluency" was a 64, his "broad math" was a 61, his "brief math" was a 64, his "math calculation skill" was a 62, and his "math fluency" was a 65 (*Id.*). Drs. Greene and Nelson also stated that MG's math skills were "characterized by an exceedingly slow response time accompanied by a high degree of inaccuracy" (R. 559). These scores are relevant to the question of whether MG's difficulties place him in the markedly impaired category of several paragraph B domains. It is unclear to the Court (and the parties' briefing does not address) whether a "marked" limitation with respect to the cognitive/communicative function, for instance, requires a full scale IQ of 70 or lower, or whether it is sufficient for other areas of cognition, such as processing speed, math skills, and writing fluency, to aggregate to the point where, when taken together, an ALJ could find the existence of a marked impairment in this domain. These are matters the ALJ was required to address in reaching his finding that MG lacked marked impairments. The absence of discussion results in a failure to create a logical bridge between the evidence and the ALJ's conclusion that MG showed no marked impairment relative to any of the four paragraph B domains.

## B.

Plaintiff next contends that the ALJ improperly assessed whether MG satisfied the functional equivalence criteria for Listing 112.11. However, because we already have found a remand appropriate on other grounds, we need not address these arguments other than to suggest

---

[8]As set forth in Listing 112.00, when standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a "marked" impairment. The test used to calibrate MG's full scale IQ is the Weschsler Intelligence Scale for Children, 4th Edition (WISC-IV). Drs. Greene's and Nelson's report indicates that the mean score on the WISC-IV is 100, and that one standard deviation from the mean is 15 points. Two standard deviations below the mean score of 100 is a score of 70.

that on remand, the ALJ evaluate all the information in the case record in order to consider how well the claimant performed his activities as compared to other children his age. *See* 20 C.F.R. § 416.926(a)(b). This evaluation should include an evaluation of the weight to be afforded the post-hearing teacher questionnaire completed by Michael McKinney. The questionnaire states on its face that it should be completed by the person most familiar with MG, and Mr. McKinney noted emphatically that he was <u>not</u> that person—yet still he filled it out. On remand, the ALJ should consider the weight given to this questionnaire, as well as the other record evidence.

## CONCLUSION

For the reasons set forth above, the Court grants Ms. Martin's motion for summary judgment (doc. # 19) and denies the Commissioner's motion for summary affirmance (docs. # 29, 30). This case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: April 25, 2016**